UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ALI AMINE,

        Plaintiff,

v.

                                                 Case No. 09-13454

BRENTON KING and EDWARD VILLEMAIRE,      Honorable Julian Abele Cook, Jr.

        Defendants.


<u>ORDER</u>

      This case involves a complaint by the Plaintiff, Ali Amine, who has accused the two Defendants, Brenton King and Edward Villemaire - both of whom are law enforcement officers with the Dearborn, Michigan Department of Police - of  (1) assault and battery; (2) false imprisonment; (3) false arrest; (4) malicious prosecution; and (5) a violation of 42 U.S.C. § 1983.[1]

      Although this case was originally filed in a state court (Wayne County Circuit Court of Michigan), it was removed to this Court on the basis of its federal question jurisdiction. 28 U.S.C. §§ 1331, 1441, and 1446.  Currently before the Court are the parties' cross-motions for summary judgment.

I.

      The parties' respective versions of the salient facts in this case are highly contested and summarized succinctly below.

_____

      [1]The § 1983 claim has been filed by Amine against King only.

1

On July 24, 2007, Amine and his friend, Ali Al-Khalidi,[2] were traveling in Amine's father's black Jeep Cherokee automobile. At approximately 9:00 p.m., the vehicle was stopped in Dearborn, Michigan by King who - in his official capacity while on road patrol as a law enforcement officer - made a preliminary observation from his police car that the Jeep did not have a visible license plate. According to King, at the time of this stop, Amine was situated in the driver's seat and was not wearing a seat belt, and Al-Khalidi was located in the front passenger seat. King further states that, subsequent to the stop, he (1) realized that the Jeep did have a temporary license plate affixed to the interior of its back window which had been difficult to see through the vehicle's tinted window, and (2) observed the Jeep rock back and forth and, upon directing his spotlight toward the vehicle, saw the driver and passenger exchange their positions in the front seat. Believing this to be suspicious behavior, King made a radio request for backup police assistance. Amine, on the other hand, argues that Al-Khalidi was the driver of the vehicle the entire time and that the two individuals never switched places.

Thereafter, King approached the Jeep and asked its occupants for their respective operator's licenses and documentation of the Jeep's ownership. He also ran a search on the Law Enforcement Information Network ("LEIN"), from which he learned that Amine had a suspended driver's license and two prior convictions or pending charges for operating a motor vehicle while intoxicated ("OWI"). Amine, in response to further questioning, advised King that he had consumed "a beer" while at a restaurant with Al-Khalidi. King then handcuffed Amine and placed him in the back of

---

[2]The disagreement between the parties extends to the spelling of the last name of Amine's friend. Amine spells his name "Ali-Khalidi," whereas the Defendants have identified him as "Al-Khalidi." Without attempting to make a definitive declaration on this issue and for the limited purpose of this order, the Court will use the latter, as that is the spelling Al-Khalidi himself provided in his preliminary examination testimony. (Pl.'s Mot. for Summ. J., Ex. B at 23:9).

his police car, informing him that he was being arrested for OWI. King has stated - and Amine does not dispute - that Amine consented to a preliminary "field" breath test which indicated he had a blood alcohol level of .09%.

Shortly thereafter, the other Defendant, Edward Villemaire, arrived on the scene in response to King's earlier call for backup. The Defendants handcuffed Al-Khalidi and placed him in the back of Villemaire's police car. Both officers conducted a search of the Jeep and found no drugs or other contraband. King began to question Al-Khalidi while he was still in the back of the police car. In what the Defendants claim is a common police tactic to elicit admissions, King told Al-Khalidi that drugs had been found in the car and that he saw him and Amine switch seats. He further warned Al-Khalidi that the driver of the vehicle would be held responsible for the drugs found in the car. Nevertheless, Al-Khalidi maintained that he, and not Amine, was in fact the driver of the vehicle. Al-Khalidi was then released and the Jeep was impounded. Amine was taken to the Dearborn police station where he was charged with OWI, third offense, and held without bond. After being arraigned the following day, he was released on $2,500 bond.

During the preliminary examination which followed, King and Al-Khalidi each gave testimony that was consistent with the Defendants' and Amine's versions, respectively, of the incident.[3] Notwithstanding the conflicting testimony, the presiding judge concluded that the

---

[3]In his briefing, Amine claims that Officer King never testified to seeing any "rocking" at the preliminary hearing, but this is false. (*Compare* Pl.'s Mot. for Summ. J. at ¶ 6.b, *and* Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. at 6, *with* King Test. 14:23-15:3, available at Pl.'s Mot. for Summ. J., Ex. B ("[A]s soon as the vehicle stopped the vehicle started to rock. As I always do I was affixing my spotlight on the vehicle and I illuminated the interior and observed two people switching seats in the front of the vehicle.")). Amine also claims that neither the perceived lack of a license plate nor his alleged failure to wear a seatbelt were reflected in the police report, yet this is also not true. (*Compare* Pl.'s Mot. for Summ. J. at ¶ 4, *with* Police Report, July 24, 2007, Copy at Def.'s Mot. for Summ. J., Ex. D ("While on patrol, I observed a driver (later identified as Amine) . . . not wearing his seat belt and no license plate affixed to the rear of [the vehicle].").

3

prosecution had produced a sufficiency of evidence upon which to establish probable cause to believe that Amine had committed the offenses of OWI and driving with a suspended license. As a result, he was bound over for trial. A jury subsequently found him not guilty and the charges against him were dismissed.

This lawsuit followed.  Both parties have submitted motions for summary judgment which are now before the Court for resolution.

## II.

The purpose of Federal Rule of Civil Procedure 56 "is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Therefore, the entry of a summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if its proof "would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties." *Aqua Grp., LLC v. Fed. Ins. Co.*, 620 F. Supp. 2d 816, 819 (E.D. Mich. 2009) (citing *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). When assessing a motion for the entry of a summary judgment, a court "must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

The moving party has the initial obligation of identifying those portions of the record that demonstrate the absence of any genuine issue of a material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must "come forward with some probative evidence to support its

claim and make it necessary to resolve the differences at trial." *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir. 1991); *see also Anderson*, 477 U.S. at 256. The presence or absence of a genuinely disputed issue of a material fact must be established by (1) a specific reference to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or (2) a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

### III.

Amine submits that he is entitled to a summary judgment in connection with his § 1983 claim because there is no genuine issue of a material fact that his rights under the Fourth Amendment were violated by his seizure, arrest, search, and subsequent prosecution without probable cause. U. S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). In response, King submits that he (1) had probable cause to arrest Amine, and (2) is entitled to qualified immunity which provides him with protection from Amine's § 1983 claim.

In order to establish a claim under 42 U.S.C. § 1983, a plaintiff - such as Amine - must set forth those facts that - when construed in his favor - clearly establish "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) [that has been] caused by a person

acting under the color of state law."[4] *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

The doctrine of qualified immunity generally protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Its purpose is "to shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

This doctrine has also been described as a broad standard which is designed to protect "'all but the plainly incompetent or those who knowingly violate the law.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, 'if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized.'" *Id.* (quoting *Malley*, 475 U.S. at 341).

"Once [this doctrine has been] raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *O'Malley v. Flint*, No. 09-2037, 2011 WL 3055227, at *2 (6th Cir. July 26, 2011). The Sixth Circuit has declared that a two-factor test should be applied to determine if a plaintiff can overcome an officer's assertion of qualified immunity.[5]

---

[4]There is an implicit agreement among the parties that King was acting under the color of state law at all times that are relevant to this lawsuit. Therefore, the consideration by the Court will be confined to a determination of whether Amine's Fourth Amendment rights were violated.

[5]The Sixth Circuit has applied both a two-factor and a three-factor test. *Compare Polk v. Hopkins*, 129 F. App'x 285, 288 (6th Cir. 2005) (applying a three-factor test), *with Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (applying a two-factor test). While neither test has been explicitly adopted in this Circuit, the more recent line of cases seems to suggest that the court has preferred the two-factor test.

Thus, a defendant is entitled to qualified immunity unless a court determines that (1) the facts - when viewed in a light that is most favorable to the plaintiff - show that a constitutional violation has occurred;[6] and (2) the violation involved a clearly established constitutional right of which a reasonable person would have known.[7] *E.g.*, *Dominguez*, 555 F.3d at 549; *Phillips v. Roane Cnty.*, 534 F.3d 531, 538-39 (6th Cir. 2008).

Applying these standards, the Court will examine each of Amine's claimed violations seriatim.

A.      Seizure

1.      Justification at The Inception

The Fourth Amendment does not apply to casual encounters with the police. Rather, this constitutional protection vests "only after [a] citizen has been seized." *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (citation and internal quotation marks omitted). A "seizure" occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)); *see also United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009).

An investigative seizure is thought to be reasonable under the Fourth Amendment if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances that justified it.

---

[6]Thus, a finding of a constitutional violation will simultaneously establish the first prong of Amine's § 1983 claim against King.

[7]Two years ago, the Supreme Court held in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), that the lower courts now have the discretion to address the second factor first. In so doing, the Court overturned an earlier decision in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), in which it specifically declared that the first and second factors must be analyzed in that order.

*Terry v. Ohio*, 392 U.S. 1, 19-20 (1968); *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006) ("An ordinary traffic stop is like an investigative detention, the scope of which is governed by *Terry* principles."). As for the first prong of this analysis, there has been much discussion within the Sixth Circuit as to whether a traffic stop for a civil infraction - as opposed to a misdemeanor or felony  -  must be based upon probable cause or if a reasonable suspicion is sufficient.[8] *United States v. Simpson*, 520 F.3d 531, 538-41 (6th Cir. 2008). In *Simpson*, the Sixth Circuit described in great detail the apparent intra-circuit conflict regarding the applicable standards for various levels of offense, and summarized the then-current state of play as follows: "reasonable suspicion" justifies a stop for a completed or an ongoing felony or an *ongoing* misdemeanor, but, on the other hand, "probable cause" is required to justify a stop for a *completed* misdemeanor. *Id.* The *Simpson* court also noted that Sixth Circuit precedent appeared to suggest that probable cause was required to justify a stop for a civil infraction, but opined that the relevant precedent was premised on an incorrect assumption. *Id.* at 539-41 and nn. 8 & 11 (citing *Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004)). Moreover, *Simpson* noted that "virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation," and expressed its "grave doubts about the correctness" of this apparent Sixth Circuit rule to the contrary. *Id.* at 540. Nevertheless, later cases have applied the probable cause standard to civil infractions, *e.g.*, *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("This circuit has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an

---

[8]Under Michigan law, failure to clearly display a license plate is a civil infraction. Mich. Comp. Laws §§ 257.225, 257.255. Therefore, Sixth Circuit cases that deal with similar violations in those states where the violation constitutes a misdemeanor are distinguishable.

8

ongoing crime to make a stop for a criminal violation."),[9] and, out of an abundance of caution, the Court will do so here.

"An officer has probable cause when 'the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). The probable cause analysis is performed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein*, 275 F.3d at 550 (citation and internal quotation marks omitted).

Here, the question of probable cause is a close one.[10] King testified during the preliminary examination that, after passing the Jeep, he looked in his rear-view mirror and was unable to see a license plate on the car. It is undisputed that (1) there was no metal license plate in the regular location; (2) there was a temporary paper license plate in the rear window; (3) the rear window was tinted; (4) the events took place at night, albeit in a parking lot illuminated by parking lights; and (5) King's observation of the rear of the vehicle was through his rear-view mirror while traveling in the opposite direction. Given these factors, a reasonable jury could find that King possessed probable cause to believe that the Jeep was traveling without clearly displaying a license plate. However, "in general, the existence of probable cause in a § 1983 action presents a jury question,

---

[9]In *Blair*, the Sixth Circuit recognized the conflict in the case law regarding the standard that is applicable to civil infractions, and - notwithstanding the seemingly unequivocal language therein - stated that it need not, and therefore would not, resolve the question as to which standard applies to civil infractions.

[10]For the purpose of the pending motions, the Court will consider the propriety of the stop based only on the perceived license plate violation. This conclusion has been made here because whether Amine and Al-Khalidi were wearing seatbelts is a genuinely disputed issue which cannot be the basis for a summary judgment. However, the Court notes that, if a jury gave full credence to King's claim that neither passenger in the Jeep was wearing a seatbelt, he would be deemed to have had probable cause to effectuate the stop.

unless there is only one reasonable determination possible." *Miller*, 606 F.3d at 248. Because it would also be reasonable for the jury to find that King lacked probable cause,[11] this question - standing alone - would not be proper for a resolution on a motion for summary judgment.

However, if Amine cannot make out the second prong of the qualified immunity inquiry, the entry of a summary judgment in King's favor may still be proper. "In regard to the second part of the qualified immunity analysis, the Supreme Court has stated that '[t]he relevant, dispositive inquiry in determining [if] a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Klein*, 275 F.3d at 550 (quoting *Saucier*, 533 U.S. at 202); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (in determining whether right was clearly established, "the salient question . . . is whether the state of the law [at the time of the alleged violation] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional"); *O'Malley*, 2011 WL 3055227, at *2 ("Generally, summary judgment based on qualified immunity is proper if officer was not on notice that his conduct was clearly unlawful). "In undertaking this inquiry, we do not assess the right violated at a high level of generality, but, instead, we must determine whether the right was 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Myers v. Potter*, 422 F.3d 347, 356 (6th Cir. 2005) (citation and internal quotation marks omitted); *see also Saucier*, 533 U.S. at 201 ("This [clearly established] inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general

---

[11]For example, a reasonable jury might determine that a prudent officer would not have concluded that the offense had been committed without attempting to get a better look at the rear of the vehicle *before* deciding to effectuate the stop.

proposition."); *O'Malley*, 2011 WL 3055227, at *3 ("This standard requires the courts to examine the asserted right at a relatively high level of specificity[,] and on a fact-specific, case-by-case basis." (citation and internal quotation marks omitted)).

The apparent Sixth Circuit rule that a traffic stop for a civil infraction must be supported by probable cause - as opposed to reasonable suspicion - was not "clearly established" at the time of the events in question. *See Simpson*, 520 F.3d at 538-41 (describing conflicting Sixth Circuit authority). Given the uncertainty in the state of law in late July of 2007, it would not have been clear to a reasonable officer that a reasonable suspicion was an insufficient basis for effecting a traffic stop for a civil infraction. *See Sterling-Ward ex rel. Sterling v. Tujaka*, 414 F. Supp. 2d 727, 736 (E.D. Mich. 2006) ("If the controlling law is not clearly established, an official cannot be liable, because a reasonable person would not be expected to know how to structure his conduct to avoid liability." (citation and internal quotation marks omitted)).

The reasonable suspicion standard is "a lower threshold" than its probable cause counterpart, *O'Malley*, 2011 WL 3055227, at *8 (citing *Terry*, 392 U.S. at 30), that is met where the officer can "point to specific, articulable facts that gave rise to a 'reasonable suspicion' that the suspect was engaged in criminal activity," *United States v. Gross*, No. 08-4051, 2011 U.S. App. Lexis 12197, at *9 (6th Cir. June 15, 2011) (citing *Terry*, 392 U.S. at 21).  The officer must be able to "articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation and internal quotation marks omitted)

The same undisputed facts that make probable cause a close question are sufficient to establish that King's arrest of Amine was supported - at a minimum - by reasonable suspicion. His initial inability to see any license plate was not simply "an inchoate and unparticularized . . .

11

hunch." Rather, King was able to point to the specific facts that (1) there was no license plate in the usual location and (2) he was unable to see any temporary license plate due to the darkness of the night and the tint on the window. These factors made it reasonable for this law enforcement officer to suspect that the Jeep may have been traveling without a "clearly visible" registration plate, in contravention of Mich. Comp. Laws § 257.225. Thus, King is entitled to the protection of qualified immunity - at least with respect to the first prong of the *Terry* analysis. The Court now turns to the second prong.

2.    <u>Scope of the Detention</u>

"The scope of activities during an investigatory detention must reasonably be related to the circumstances that initially justified the stop." *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991). Stated differently, the Court must examine "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Smoak*, 460 F.3d at 779.

"[A] *Terry* stop permits law enforcement to 'detain [a] person briefly in order to investigate the circumstances that provoke suspicion.'" *United States v. Foster*, 376 F.3d 577, 586 (6th Cir. 2004) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). However, "[o]nce the purpose of an ordinary traffic stop is completed, the officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *Perez*, 440 F.3d at 370; *see also Foster*, 376 F.3d at 586 (citation and internal quotation marks omitted) ("[W]hen there is no longer any reasonable suspicion of criminal activity, the detained individual is constitutionally free to leave.").

12

Amine argues that, as soon as King turned on his spotlight and recognized that the Jeep did bear a valid temporary license plate, any justification for the stop immediately dissipated and King was not permitted to continue his investigation.[12] Presumably this argument would require that King, having effected a traffic stop, should simply drive away without making any contact with the occupants of the vehicle upon observing the temporary tag.

There is some authority - albeit in dicta - for Amine's position. In *United States v. Foster*, 65 F. App'x 41 (6th Cir. 2003), a police officer effected a traffic stop because of the failure by the operator of the vehicle to display a license plate. Upon stopping the car, the officer realized that a temporary license tag had been affixed to the rear window. Nevertheless, he approached the driver and requested his identification. *Id.* at 42-43. The Sixth Circuit rejected the defendant's argument that, as soon as the officer saw the temporary license tag, he no longer had any right to detain the defendant - in part because, under Kentucky law, the plate was required to be displayed *and* illuminated. *Id.* at 44-45. Thus, even if the officer's belief that the vehicle did not bear a plate was incorrect, he still had cause to detain the vehicle because of the violation of the illumination requirement. The court also noted that, "[h]ad [the defendant] been stopped solely for failing to display a registration plate on his vehicle, an *argument could be made* that [the officer's] discovery of the temporary tag obviated any further need to detain the defendant and that, as a result, no

---

[12]Once again, the Court leaves aside the issue of whether King did or did not witness either or both of the occupants of the Jeep not wearing seat belts at the time of the stop. The Court also puts aside the question as to whether Amine and Al-Khalidi switched seats  - as claimed by King - because this, too, is a genuinely disputed issue over a material fact that is improper for a resolution by summary judgment. However, if the jury credited King's version of events, (1) the alleged seatbelt violation would not have been resolved upon his observation of the temporary license tag, so the stop would continue to be justified; and (2) even in the absence of a seatbelt violation, the seat-switching would have given King a reasonable suspicion that would justify an expansion of the scope of the stop.

further investigation was proper." *Id.* at 44 (emphasis added).

However, the Sixth Circuit has also - once again, in dicta - rendered the contrary conclusion. In *United States v. Elmore*, 304 F.3d 557, 559 (6th Cir. 2002), a police officer effected a traffic stop because of the vehicle operator's failure to display a visible rear license plate. However, "[u]pon very close inspection, [he] was able to discern - and with some difficulty, read - through the car's heavily tinted rear window a temporary license tag." *Id.* Nevertheless, the police officer approached the driver and requested his identification. *Id.* When the information given did not match the results of a previous LEIN check, the officer initiated questioning of the occupants of the car. *Id.* Due to inconsistencies in their stories and the smell of marijuana, he requested and obtained the passengers' consent to search the vehicle, which led to the discovery of a large amount of cash and cocaine. *Id.* The Sixth Circuit rejected the defendant's claim that the stop became illegal from the moment that the officer saw the temporary tag in the window. First, the court noted that, even after observing the license tag, the officer continued to have reason to believe that a violation was occurring because the relevant law required a motorist to have a temporary license tag clearly visible and not obstructed by the tint of a window. *Id.* at 559, 561 n.1. Separately, the court opined that, in any event, the existing case law within the Sixth Circuit "makes it plain that '[a] law enforcement officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion that a crime has been committed, and asking him whether he is willing to answer some questions.'" *Id.* at 561 n.1 (quoting *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (en banc)); *see also Simpson*, 520 F.3d at 543 ("Once [the officer] approached the vehicle to explain the reason for the stop - something that is surely permissible even if the officer, after executing the stop, had concluded that there was no violation

14

of law - he immediately developed further reasonable suspicion (the smell of marijuana) to detain the vehicle.").

Similarly, Michigan law requires that a registration plate be "in a place and position which is clearly visible. The plate shall be maintained free from foreign materials that obscure or partially obscure the registration information, and in a clearly legible condition." Mich. Comp. Laws § 257.225. Arguably, even upon observing the temporary license tag, King may have continued to have probable cause to believe that a violation was being committed; namely, that the tag was not "clearly visible" due to the tinted window. *See United States v. Dycus*, 151 F. App'x 457, 460-61 (6th Cir. 2005) (fact that officer could not see license plate until he got within fifteen to twenty yards of vehicle provided probable cause to effect stop for failure to clearly display license plate). However, in the absence of any evidence regarding the opacity of the tinted window or the ease or difficulty of observing the license tag, the Court is unable to make this determination at the summary judgment stage.

Under *Erwin*, as interpreted by *Elmore*, even if probable cause or reasonable suspicion dissipated as soon as King saw the temporary license tag, he was still permitted - consistent with the Fourth Amendment - to approach the stopped vehicle to make routine inquiries of its occupants. 304 F.3d at 561 n.1. On the other hand, *Foster* appears to suggest that such an action *could* constitute a Fourth Amendment violation. 65 F. App'x at 44 (opining that this argument "could be made"). The Court need not resolve this apparent contradiction in precedent because, even assuming that King had unconstitutionally extended the scope of the stop by approaching the Jeep after he became aware that it did bear a registration license tag, it is clear that this view was (and apparently still is) plainly not "clearly established." In light of facially contradictory expressions

15

in *Elmore* and *Foster*, it cannot be said that King was on notice that he would violate the Fourth Amendment by approaching the vehicle to make inquiries of its occupants after becoming aware that the Jeep bore a temporary license tag. Therefore, King is entitled to qualified immunity with respect to his initial seizure of the vehicle.

B.     Arrest/Imprisonment

"The general rule is that 'a police confinement which . . . goes beyond the limited restraint of a *Terry* investigatory stop may be constitutionally justified only by probable cause.'" *Richardson*, 949 F.2d at 858 (quoting *Florida v. Royer*, 460 U.S. 491, 496 (1983)). The Fourth Amendment is not violated when an officer makes a warrantless custodial arrest for a minor offense as long as he has probable cause to believe that the person committed the offense in his presence. *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001). The Supreme Court has held that the test for determining if probable cause to arrest exists is "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *United States v. Dotson*, 49 F.3d 227, 230 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Additionally, "probable cause to believe that a person has committed *any* crime will preclude an unlawful arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." *Alman v. Reed*, No. 08-CV-14168, 2010 WL 4106686, at *15 (E.D. Mich. Oct. 7, 2010) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)); *see also United States v. Harness*, 453 F.3d 752, 755 (6th Cir. 2006).

Amine's admission that he had consumed one beer is fatal to his claim on this issue because

16

he was under the legal drinking age at the time of this incident.[13] This admission by a minor to a police officer that he had recently consumed one beer clearly establishes probable cause that an offense had been committed in his presence. *See* Mich. Comp. Laws § 436.1703(1) (making it an offense for minor to "have any bodily alcohol content"). Amine appears to have conceded as much in his deposition testimony. (Def.'s Mot. for Summ. J., Ex. A at 68: 2-3 ("Q: Could you have been arrested for minor [in] possession?  A: Sure."). Due to the fact that probable cause existed for Amine's arrest, he is now precluded from asserting a Fourth Amendment violation based on an unlawful arrest.

Similarly, a false imprisonment claim requires a plaintiff to show that the underlying arrest lacked probable cause. *E.g.*, *Wolgast v. Richards,* 389 F. App'x 494, 501 (6th Cir. 2010) (presence of probable cause defeats Fourth Amendment false imprisonment and unlawful arrest claims); *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003) ("To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause. If the arrest was legal, there has not been a false arrest or a false imprisonment."). Thus, this claim likewise cannot support a Fourth Amendment violation here.

Because Amine's arrest and imprisonment were not in violation of his constitutional rights, the Court need not consider the second prong of the qualified immunity inquiry.

---

[13]Amine, who was born on November 1, 1987, was nineteen years of age on July 24, 2007 (the date of his arrest). The legal drinking age in Michigan was, and continues to be, twenty-one years of age. Mich. Comp. Laws §§ 436.1703(1) ("A minor shall not purchase or attempt to purchase alcoholic liquor, consume or attempt to consume alcoholic liquor, possess or attempt to possess alcoholic liquor, or have any bodily alcohol content, except as provided in this section. A minor who violates this subsection is guilty of a misdemeanor . . . ."), 436.1109 (defining "minor" as "a person less than 21 years of age").

C.      Searches

Amine contends that his Fourth Amendment right against unlawful searches was violated by (1) the administration of a preliminary "field" breath test; (2) the "pat-down" by the Defendants which was incident to his arrest; and (3) the search of his vehicle after his arrest. Amine does not appear to argue that these searches were performed in an unconstitutional manner. Rather, he asserts that they were unconstitutional per se because King lacked a lawful basis for the stop at its inception. Although this claim has already been rejected, the Court will nevertheless examine these three searches in their own right.

As a general proposition, the Fourth Amendment requires that searches be conducted pursuant to a warrant issued by an independent judicial officer. *United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994) (quoting *California v. Carney*, 471 U.S. 386, 390 (1985)).  However, the Supreme Court has recognized that there are several exceptions to this general rule, which will be explored only to the extent that they may pertain to Amine's claims.

1.      Preliminary "Field" Breath Test

Pursuant to one such exception, warrantless searches are proper if they are performed with the subject's voluntary consent. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).  Here, Amine does not challenge King's claim that the preliminary "field" breath test was performed with his voluntary consent after having been informed of his right to refuse. Therefore, this search did not violate his Fourth Amendment rights. *See Mahan v. Sundmacher*, No. 1:06-cv-54, 2007 WL 1395476 (W.D. Mich. May 10, 2007) ("Even though administration of the breathalyzer amounted to a search, it is 'well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.'" (quoting *United*

18

*States v. Carter*, 378 F.3d 584, 586 (6th Cir. 2004))).

      2.    <u>Pat-Down</u>

Similarly, a police officer is permitted to conduct a warrantless search of an arrestee's person incident to a valid custodial arrest, even if (1) it is only for a routine traffic violation and (2) the officer has no reason to believe that the search would uncover weapons or criminal evidence. *United States v. Robinson*, 414 U.S. 218, 234-35 (1973). Because the Court has already established that Amine's arrest was lawful, *supra* Section III.B, King's search of Amine's person incident to his arrest did not violate the Fourth Amendment.

      3.    <u>Vehicle Search</u>

In *New York v. Belton*, 453 U.S. 454, 460 (1981), the Supreme Court held that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." The Sixth Circuit has interpreted this holding in *Belton* as authorizing law enforcement officers "to search a vehicle incident to a lawful custodial arrest of its occupants without a warrant or probable cause, even after the arrestee was handcuffed and placed in the backseat of a police cruiser." *United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011) (citation and internal quotation marks omitted); *see also United States v. Patterson*, 993 F.2d 121, 123 (6th Cir. 1993).

The Supreme Court refined *Belton* in 2009, and held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 129 S. Ct. 1710, 1723 (2009). However, the Court noted that, "[b]ecause a broad reading of *Belton* has been widely accepted, the doctrine of

19

qualified immunity will shield officers from liability for searches conducted in reasonable reliance on that understanding."[14] *Id.* at 1723 n.11.

Here, the search of the Jeep incident to Amine's arrest did not violate the Fourth Amendment under either *Belton* or *Gant*. Under *Belton*, which was the prevailing law at the time of the challenged search, the search of the Jeep was plainly reasonable as an incident to Amine's lawful arrest. The search would also have been permissible under *Gant* because it was reasonable for King to believe that evidence that Amine had been drinking may be found in the car, in the form of, for example, beer cans or bottles. This conclusion is supported by King's contention that he smelled alcohol when he approached the Jeep. Putting aside the issue of whether Amine was in the driver's or the passenger's seat, he admitted having consumed "a beer" despite being under the age of twenty-one years and he was arrested for OWI. A finding of an alcoholic container in the car would clearly have been relevant to the offense of arrest. Thus, the search of the Jeep was reasonable under *Gant* as well.

Because none of these searches contravened Amine's Fourth Amendment rights, the Court need not consider the second prong of the qualified immunity analysis. King is entitled to the protections of qualified immunity with respect to Amine's § 1983 claim based on all three searches.

D.   Prosecution

Amine also alleges a Fourth Amendment violation based on malicious prosecution. King

---

[14]*Gant* does apply retroactively to those criminal cases that were still pending on direct review when it was decided. For example, in *Buford*, the Sixth Circuit held that even though a police officer's conduct in searching the defendant's vehicle was done "in accordance with our well-settled precedent at the time it was conducted," the retroactive application of *Gant* necessitated the conclusion that the search of the defendant's car was unconstitutional because he and his passenger were secured and the police could not expect to find evidence in the car relevant to the defendant's arrest. *Buford*, 632 F.3d at 270.

argues that the existence of probable cause to arrest Amine is fatal to this claim. Amine submits that, because - in his estimation - the initial stop was unlawful, the subsequent prosecution was also unlawful. The Court disagrees with both arguments.

In the recent case of *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010), the Sixth Circuit for the first time clearly defined the elements that are necessary to succeed on a claim of malicious prosecution pursuant to the Fourth Amendment. An aggrieved plaintiff must show that (1) the defendant made, influenced, or participated in the decision to criminally prosecute him, (2) there was a lack of probable cause for the criminal prosecution, (3) as a consequence of a legal proceeding, he sustained a deprivation of liberty, "as understood in our Fourth Amendment jurisprudence, apart from the initial seizure," and (4) the criminal proceeding was resolved in favor of the aggrieved plaintiff. *Id.* at 308-09.

A genuine issue of a material fact remains with respect to the first element. In *Sykes,* the court concluded that an officer, who made misrepresentations or gave false testimony at a preliminary hearing, influenced or participated in the decision to prosecute an individual.[15] *Id.* at 313-14. During the preliminary hearing in the instant case, King - the only witness called by the State - testified that he saw the two occupants of the Jeep switch their seats subsequent to the now-challenged stop. His testimony was critical to the finding of probable cause. The judge stated that

---

[15]The Court need not consider the interaction, if any, of Amine's malicious prosecution allegations and the doctrine of absolute immunity for statements made in judicial proceedings, *see, e.g.*, *Thurmond v. Cnty. of Wayne*, Nos. 09-1078, 09-2241, 2011 WL 2270901 (6th Cir. June 10, 2011) (police officer is absolutely immune from liability for false testimony given during preliminary examination), because King has neither raised nor proven his entitlement to this affirmative defense, *see, e.g.*, *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986) ("[I]mmunity, whether qualified or absolute, is an affirmative defense which must be affirmatively pleaded . . . [and] it follows that failure to do so can work a waiver of the defense.").

the question of King's credibility was a "tough call," but that he would "give the benefit of the doubt to the police officer in this case . . . - if we believe the police officer, Mr. Amine was driving and he was - he was driving while he was intoxicated, and the testimony was that his license was suspended based upon the LEIN." (Pl.'s Mot. for Summ. J., Ex. B at 42:12-23).

Amine argues that King gave false testimony during the hearing for the purpose of establishing probable cause, a charge that is challenged by this law enforcement officer. Each party has presented sufficient evidence in the form of deposition and preliminary examination testimony to create a genuine issue, and whether King falsified his testimony is material to a determination of whether he participated in the decision to prosecute.

Likewise, a genuine issue of material fact remains with respect to the second element. Prior to *Sykes*, some cases seemingly held that § 1983 claims predicated on malicious prosecution necessarily failed if probable cause for the arrest was established. *Wolgast*, 389 F. App'x at 501 ("[T]he existence of probable cause for an arrest totally precludes any section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution, regardless of whether the defendants had malicious motives for arresting the plaintiff." (quoting *Gumble v. Waterford Township*, 171 F. App'x 502, 507 (6th Cir. 2006))); *Hansel v. Bisard*, 30 F. Supp. 2d 981, 985-86 (E.D. Mich. 1998) ("Section 1983 claims predicated on false arrest, false imprisonment, or malicious prosecution fail if probable cause for an arrest is established."). *But see, e.g.*, *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007) (emphasis added) ("What is certain, however, is that [a malicious prosecution] claim fails when there was probable cause *to prosecute* . . . ."). However, *Sykes* clarified that a probable cause to arrest and a probable cause to prosecute are two distinct issues, each of which requires separate analyses by the court. 625 F.3d at 310-11. This distinction is premised on the plain fact

22

that false arrest and malicious prosecution allege a different type of injury. "The 'tort of malicious prosecution' is 'entirely distinct from that of false arrest, as the malicious-prosecution tort 'remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process.'" *Sykes*, 625 F.3d at 308 (quoting *Wallace v. Kato*, 549 U.S. 384, 390 (2007)). This necessarily means that a finding of no constitutional violation with respect to the arrest does not automatically dispose of a corresponding malicious prosecution claim.

It has already been established that Amine was drinking under the legal age, which provided probable cause for his arrest. However, Amine was prosecuted for OWI and driving with a suspended license - not for drinking under age. The Court must determine whether probable cause existed to prosecute Amine for the offenses with which he was charged. *Cf. Carter v. Porter*, No. 5:08-CV-246, 2011 WL 778408, at *7 n.13 (E.D. Ky. Mar. 1, 2011) (distinguishing between "'a simultaneous arrest on multiple charges where, in a sense the significance of the charges for which there was not probable cause for arrest is limited as the plaintiff in the ensuing civil action could have been lawfully arrested and thus seized on at least one charge and, on the other hand, prosecution for multiple charges where the additional charges for which probable cause is absent almost surely will place an additional burden on the defendant.'" (quoting *Johnson v. Knorr*, 477 F.3d 75, 84 (3d Cir. 2007))).

Although a judicial finding of probable cause to prosecute ordinarily shields a law enforcement officer from a malicious prosecution claim, he  "cannot, in good faith, rely on a judicial determination of probable cause [to absolve him of liability] when that determination was premised on an officer's own material misrepresentations to the court." *Sykes*, 625 F.3d at 312. Here, as noted above, there remains a genuine issue of a  material fact regarding whether King

23

provided false testimony during the preliminary examination. Thus, this factor, too, has not been established in either party's favor.

The third element has been met because, apart from the initial seizure, Amine suffered a "deprivation of liberty" as understood in our Fourth Amendment jurisprudence. In *Sykes,* the Court cited *Heck v. Humphrey* for the proposition that encompassed within the notion of a deprivation of liberty is the confinement imposed on an individual pursuant to legal process. 625 F.3d at 308-09 (citing *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)). After Amine was arrested, he was transported to the police station where he was booked and held without bond. The following day, he was arraigned and released on $2,500 bond. It appears that pretrial release on bond constitutes a sufficient deprivation of liberty to support a malicious prosecution claim. *E.g.*, *Thomas v. Bedford Cnty., Tenn.*, No. 4:10-cv-7, 2011 WL 833626, at *7 (E.D. Tenn. Mar. 4, 2011) (evidence that plaintiff had to post bail to be released from pretrial detention "should be sufficient to establish that plaintiff suffered a deprivation of liberty as a consequence of the criminal charges"); *see also Albright v. Oliver*, 510 U.S. 266, (1994) (Ginsburg, J., concurring) ("[A defendant released pretrial] is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges."). *Cf. Hopkins v. Sellers*, No. 1:09-cv-304, 2011 WL 2173859, at *9 (E.D. Tenn. June 2, 2011) (malicious prosecution claim failed where plaintiff could not show deprivation of liberty because he "was never arrested, never jailed, never detained, never required to post bond, and never placed under travel restrictions"); *Briner v. City of Ontario*, No. 1:07CV127, 2011 WL 866464, at *4 (N.D. Ohio Mar. 9, 2011) (malicious prosecution claim failed where plaintiff could not show deprivation of liberty because she "was issued a summons; she was not arrested. There was no bond required and there is nothing

24

in the record to suggest that she had any restrictions placed on her movements prior to trial.").

Finally, the fourth element is met here because Amine was adjudged not guilty by the jury. This acquittal is a decision that was rendered on the merits and resolved the criminal proceeding in his favor. *See Heck*, 512 U.S. at 484 ("One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused.").

Inasmuch as genuine issues of a material fact remain with respect to the first and second elements of Amine's § 1983 claim premised on malicious prosecution, and because he has established the third and fourth elements, a summary judgment cannot be granted in favor of either party. *See Miller*, 606 F.3d at 247 (citation and internal quotation marks omitted) ("The issue of qualified immunity may be submitted to a jury only if the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury."); *cf. Richardson v. Nasser*, 421 F. App'x 611, 617-18 (6th Cir. 2011) (fact issue as to whether officer misrepresented evidence to establish probable cause to arrest precluded summary judgment on qualified immunity grounds).

In summary, King is entitled to qualified immunity regarding Amine's § 1983 claim based on the seizure, arrest, and searches, but genuine issues of a material fact remain to be litigated with respect to Amine's § 1983 claim based on malicious prosecution. Therefore, Amine's motion for summary judgment is denied with respect to his § 1983 claims. The Defendants' motion for summary judgment is (1) granted with respect to the § 1983 claim based on King's actions in stopping, searching, and arresting Amine and (2) denied with respect to the § 1983 claim based on King's participation in Amine's prosecution.

25

IV.

The Defendants next assert that Amine should be precluded from pursuing his state law

claims because governmental immunity shields them from prosecution.[16] It is their contention that

they have satisfied all of the requirements of Michigan's governmental immunity for tort liability

statute, which provides, in relevant part, as follows:

> Except as otherwise provided in this section, and without regard to the discretionary
> or ministerial nature of the conduct in question, each officer and employee of a
> governmental agency . . . is immune from tort liability for an injury to a person or
> damage to property caused by the officer [or] employee . . . while in the course of
> employment or service . . . if all of the following are met:
>
> (a) The officer [or] employee . . . is acting or reasonably believes he or she is acting
> within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a
> governmental function.
>
> (c) The officer's [or] employee's . . . conduct does not amount to gross negligence
> that is the proximate cause of the injury or damage.

Mich. Comp. Laws § 691.1407(2).

However, this portion of the tort liability statute applies only to claims of negligent - as

opposed to intentional - torts. *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 223 (Mich. 2008) (noting that

Mich. Comp. Laws § 691.1407(3) explicitly states that "Subsection (2) does not alter the law of

---

[16]Amine's response brief does not address the Defendants' governmental immunity
defense. However, a federal district court cannot grant summary judgment in favor of a movant
"simply because the adverse party has not responded. The court is required, at a minimum, to
examine the movant's motion for summary judgment to ensure that he has discharged that
burden." *Delphi Automotive Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374 (6th Cir. 2011)
(quoting *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)). In any event, the Defendants bear
the burden of proving their entitlement to governmental immunity. *Odom v. Wayne Cnty.*, 760
N.W.2d 217, 227-28 (Mich. 2008) (individual government employee - as opposed to a
governmental agency - who seeks the protection of governmental immunity bears the burden of
raising and proving his entitlement thereto).

intentional torts as it existed before July 7, 1986."). The state law claims upon which Amine relies (to wit, assault and battery,[17] false imprisonment, false arrest, and malicious prosecution) are all intentional torts. *Miller*, 606 F.3d at 254 (false arrest/false imprisonment, malicious prosecution, and assault and battery are all intentional torts because each allegation contains intent as an element); *Odom*, 760 N.W.2d at 228 ("It is equally clear that plaintiff pleaded intentional, rather than negligent, torts. Plaintiff asserted claims of false imprisonment and malicious prosecution, both of which contain intent as an element.").

In *Odom*, the Michigan Supreme Court reaffirmed the pre-1986 governmental immunity test as it applies to intentional tort cases. 760 N.W.2d at 228. To fall within the protection of governmental immunity, a lower ranking government official or employee must show that:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

*Id.* at 228.

Because the two Defendants' participation in the underlying events differ, the Court will analyze these factors independently for each person. As for King, there is no dispute that - during

---

[17]Amine has not advanced any facts in support of his assault and battery claim. Indeed, he has not identified any wrongful acts by either or both of the Defendants which form the bases for his assault and battery accusation. In fact, it appears that Amine has virtually abandoned this claim in the summary judgment briefing. In his motion, he seeks to obtain a summary judgment with respect to the false arrest, false imprisonment, malicious prosecution, and § 1983 claims only. Similarly, he opposes the Defendants' motion for summary judgment only with respect to these claims. Moreover, he acknowledged during his deposition that he was not mistreated by the Defendants aside from his belief that the arrest was illegal and constituted procedural mistreatment. (Pl. Dep. 70:14-20). Therefore, the Court will give no further consideration to this claim, and in so doing, grants a summary judgment in the Defendants' favor with respect to it.

all of the times that are relevant to this action - he was acting (1) in the course of his employment as a municipal law enforcement officer in Dearborn, Michigan, and (2) within the scope of his authority when he stopped, questioned, searched, and arrested Amine. This factor is meant to ensure that an employee will not be immune from liability for any ultra vires conduct, but will be protected if and when he has a justifiable belief- even if he is subsequently determined to have been mistaken - that he was authorized to undertake such an action. *Id.* at 473. The Court has already determined that the arrest and concomitant confinement of Amine was lawful. Therefore, this factor is met with respect to his false arrest and false imprisonment claims. *See Thornton v. Fray*, No. 10-1906, 2011 WL 2559010, at *6 (6th Cir. June 28, 2011) ("To the extent the length of the seizure and the use of force did not violate clearly established Fourth Amendment law, the officers could also reasonably believe that they were acting within the scope of their authority for purposes of governmental immunity under state law."). However, the same cannot be said of Amine's contention that King fabricated his preliminary examination testimony to manufacture probable cause. *Hinchman v. Moore*, 312 F.3d 198, 205-06 (6th Cir. 2002) ("Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional."). Therefore, King has not established the first prong of the governmental immunity analysis with respect to Amine's malicious prosecution claim.

The good faith requirement essentially requires an employee to prove that he acted without malice. *Odom*, 760 N.W.2d at 225. This is a subjective test in that "[i]t protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* at 229. Amine has neither alleged nor proffered any evidence that King acted with malice when he effected the stop, which  - as discussed above - was supported

28

by, at a minimum, reasonable suspicion. Furthermore, there is neither any suggestion nor any proof that King - upon learning that Amine (1) had consumed a beer, (2) possessed multiple prior OWI arrests, and (3) was ostensibly a passenger while his friend drove his own father's car - did not have a good faith belief that the arrest and the act of taking him to the police station were proper. Therefore, King has established the second prong with respect to Amine's false arrest and false imprisonment claims.

However, as with the first prong of the analysis, a genuine issue of a material fact remains with respect to whether King's participation in Amine's prosecution was carried out in good faith. "In Michigan, '[w]hen a party is sued for malicious prosecution, a jury may infer malice from an absence of probable cause.'" *Miller*, 606 F.3d at 250 (quoting *Friedman v. Dozorc*, 312 N.W.2d 585, 617 (Mich. 1981)); *Ciak v. Lasch*, No. 96–5400, 1997 WL 535781, *4 (6th Cir. Aug. 28, 1997) (malice may be found where officer's trial testimony "was a disingenuous post-hoc attempt to justify the arrest").

As discussed above, the parties vigorously dispute whether King's preliminary examination testimony regarding his alleged observation of Amine and Al-Khalidi switching seats was truthful. Inasmuch as the determination of probable cause to prosecute was heavily based on King's testimony, if a jury credited Amine's version of the events over that of this arresting officer, it would be permitted to infer malice from his "disingenuous post-hoc attempt" to manufacture probable cause. Therefore, King has not established the second prong of his governmental immunity defense to Amine's malicious prosecution claim.

Ministerial acts are those that "constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice . . . [or the] execution of an act once a

29

decision has been made." *Odom*, 760 N.W.2d at 226 (citations and internal quotation marks omitted). Discretionary acts, on the other hand, "require personal deliberation, decision and judgment." *Id.* Examples of ministerial acts include "completing activity logs and police reports or following the procedures for booking an arrested person," while discretionary acts include "us[ing one's] judgment to determine whether there is reasonable suspicion to investigate or probable cause to arrest and to determine the amount of force necessary to effectuate an arrest." *Id.* Here, King's actions in stopping the Jeep, questioning its occupants, arresting Amine, performing the searches, and testifying in the preliminary examination were discretionary in nature. Thus, King has established the third governmental immunity factor with respect to all of Amine's claims.

However, the situation is different with respect to Villemaire. It is clear that he was acting (1) in the course of his employment as a Dearborn, Michigan law enforcement officer and (2) within the scope of his authority to the extent he was involved in the search and arrest of Amine. Likewise, there is no allegation that he undertook any of these acts with malice. In fact, he did not arrive at the scene of the stop until long after the alleged "seat-switching" activity had taken place. Moreover, Villemaire was not called upon by the prosecution or the defense to testify as a witness during the preliminary examination. Amine has not made any allegations that would support a claim that Villemaire's participation in the prosecution (if he can even be said to have participated in it in any meaningful way) was outside the scope of his authority or was carried out other than in good faith. Finally, all of Villemaire's challenged conduct was discretionary rather than ministerial in nature. Thus, Villemaire has established all three governmental immunity factors with respect to all of Amine's state-law claims.

30

In summary, King has established his entitlement to governmental immunity with respect to Amine's false arrest and false imprisonment claims, but not with respect to his malicious prosecution claim. Villemaire has established his entitlement to governmental immunity with respect to all of Amine's state-law claims.

V.

For essentially the same reasons that a summary judgment cannot be granted with respect to governmental immunity in connection with Amine's malicious prosecution claim, the Court cannot grant Amine's motion for summary judgment on that claim. Under Michigan law, the elements of malicious prosecution are:

> (1) the defendant has initiated a criminal prosecution against him, (2) the criminal proceedings terminated in his favor, (3) the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Miller*, 606 F.3d at 248 (quoting *Walsh v. Taylor*, 689 N.W.2d 506, 516-17 (Mich. Ct. App. 2004)). As previously discussed, genuine issues of a material fact remain with respect to whether (1) there was probable cause to prosecute Amine for OWI and driving with a suspended license and (2) King's participation in the preliminary examination was undertaken by him in bad faith. Therefore, the Court denies Amine's motion for a summary judgment with respect to this claim.

VI.

The Defendants argue that they are entitled to a summary judgment in their favor on Amine's counts of false arrest, false imprisonment, malicious prosecution, and § 1983 violations because they are barred from being religated under the doctrine of collateral estoppel. They contend that all of these causes of action require a demonstration of a lack of probable cause to arrest him for OWI, and

31

that Amine had a full and fair opportunity to argue these issues during the preliminary hearing. In support, the Defendants cite *Coogan v. Wixom*, 820 F.2d 170, 175 (6th Cir. 1987), *overruled on other grounds by Frantz v. Village of Bradford*, 245 F.3d 869 (6th Cir. 2001), for the proposition that "where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action." Amine counters by contending that subsequent cases have made it clear that collateral estoppel does not apply where the plaintiff challenges the integrity - rather than the sufficiency - of the evidence upon which the probable cause determination rested.

The Supreme Court has held that, when deciding whether the determination of probable cause by a state court at a preliminary hearing has any preclusive effect on a § 1983 action, the state laws relating to collateral estoppel must be applied. *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001) (citing *Haring v. Prosise*, 462 U.S. 306, 313 (1983)); *see also Hardesty v. City of Ecorse*, 623 F. Supp. 2d 855, 860 (E.D. Mich. 2009); *Molnar v. Care House*, 574 F. Supp. 2d 772, 789-90 (E.D. Mich. 2008), *aff'd*, 359 F. App'x 623 (6th Cir. 2009). Under Michigan law, collateral estoppel applies when:

> (1) there is an identity of the parties across the proceedings, (2) there was a valid, final judgment in the first proceeding, (3) the same issue was actually litigated and necessarily determined in the first proceeding, and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Darrah*, 255 F.3d at 311 (citing *People v. Gates*, 452 N.W.2d 627, 630-31 (Mich. 1990)); *Hardesty*, 623 F. Supp. 2d at 859.

32

Looking to the *Darrah* adjudication for guidance, there is no dispute that an identity of the parties in the preliminary hearing and in the current lawsuit exists. *See Buttino v. City of Hamtramck*, 87 F. App'x 499, 505 n.4 (6th Cir. 2004) (unpublished) (rejecting plaintiff's argument that identity of parties is lacking between original criminal case, in which nominal party was State of Michigan, and subsequent § 1983 action against city, police detective, and witness because Michigan courts have established exception to mutuality requirement where first action is criminal in nature and second matter is civil); *Molnar*, 574 F. Supp. 2d at 791 n.12 (same). Furthermore, the record in this case clearly indicates that a valid final judgment was entered at the conclusion of the preliminary hearing. Amine also had a full and fair opportunity to - and did - litigate the issue of probable cause in the preliminary hearing, which is deemed to be an adversarial hearing under Michigan law, *People v. Johnson*, 154 N.W.2d 671, 673 (Mich. Ct. App. 1967). The third element, however, is not satisfied here.

After *Coogan*, subsequent case law in this Circuit has indicated that *Coogan*'s preclusive effect will not apply where the plaintiff makes an allegation that the police officer supplied false information in the preliminary examination. This is because the determination of probable cause at the preliminary hearing is not the "same issue" as the question of whether the police officer misstated material facts in an attempt to manufacture probable cause. *Darrah*, 255 F.3d at 311; *see also Hinchman*, 312 F.3d at 202-03 ("[A] finding of probable cause in a prior criminal proceeding does not bar a plaintiff in a subsequent civil action from maintaining a claim for malicious prosecution under Michigan law where the claim is based on a police officer's supplying false information to establish probable cause." (citing *Darrah*, 255 F.3d at 311)); *Taylor v. City of Detroit*, 368 F. Supp. 2d 676 (E.D. Mich. 2005). In summary, when a plaintiff alleges that a police officer

33

acted in bad faith, provided false information, or misstated material facts in order to establish probable cause, collateral estoppel will not apply. *Molnar*, 574 F. Supp. 2d at 790.

Here, the state court judge relied heavily on King's testimony to find probable cause for the subsequent criminal prosecution. It is Amine's contention that King misstated material facts in an ultimately successful attempt to manufacture probable cause for his prosecution. In the case at bar - just as in *Darrah* - the issue of whether King misstated material facts is not identical to a determination of probable cause by the state court. Therefore, collateral estoppel does not apply to Counts II, III, IV, and V of Amine's complaint.

## VII.

Finally, Amine seeks an entitlement to a presumption of the evidence because, he claims, King destroyed or failed to preserve the video tape recording that had been allegedly recorded by his in-car mobile video system during the now-challenged stop.[18] King submits that no such presumption is warranted because no video was ever made due to a malfunction in the recording equipment.

Amine argues that those rules applicable to allegations of unauthorized destruction of or a failure to produce evidence are governed by state law. (*See* Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. at 10). However, this statement of law is no longer correct. In 2009, the Sixth Circuit

---

[18]It is unclear what remedy is being sought by Amine here. Although he identifies various sanctions that Michigan courts have imposed for unauthorized destruction of evidence, he argues that "the failure to preserve the recording is extremely prejudicial to Mr. Amine, and such prejudice cannot be overcome by any of the lesser sanctions hitherto employed by Michigan courts." (Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. at 11). Although Amine frames his request as one for "a presumption of the evidence," it is unclear whether he seeks to obtain an adverse inference jury instruction in the event of a trial, or is asking the Court to employ such a presumption when deciding the pending motions. However, in light of the disposition of this argument by the Court, the remedy sought by him is immaterial.

34

abandoned its earlier view that state law governs spoliation of evidence issues in those cases litigated in federal courts. Rather, it joined the majority of other circuits in holding that federal law must be applied in these circumstances. *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (en banc).

Thus, the Sixth Circuit requires a party who seeks a spoliation instruction to make a three-pronged showing; namely, that (1) the party with control over the evidence had a duty to preserve it, (2) the evidence was destroyed with a culpable state of mind, and (3) the destroyed evidence was relevant to the party's claim or defense. *Jennings v. Bradley*, 419 F. App'x 594, 599 (6th Cir. 2011) (citing *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010)). However, where - as here - there is no evidence to suggest that the purportedly destroyed evidence ever existed, such an inference would be wholly inappropriate. *See Jennings*, 419 F. App'x at 599-600 (affirming denial of adverse inference request where defense maintained the requested video was never made and plaintiff presented no evidence to the contrary); *Terry v. U.S. Enrichment Corp.*, No. 2:09-CV-624, 2011 WL 2635814, at *9 (S.D. Ohio July 5, 2011) (denying request for spoliation instruction where plaintiff could offer nothing other than "rank speculation" in the face of defendants' claim that requested records did not exist).

Here, the Defendants have provided evidence which demonstrates that the in-car mobile VHS video systems were antiquated and subject to such high rates of malfunction that, shortly after the events here in question, the police department had decided to entirely suspend its use until the current equipment could be replaced with new, digital versions. (*See* Defs.' Resp. to Pl.'s Mot. for Summ. J., Exs. G, H, & I). Video was either unrecorded or indiscernible in over thirty-four percent of the cases where video was requested pursuant to the Freedom of Information Act. (*Id.* at Ex. H). King stated during his deposition that he did not know if his system worked on the day of question.

35

Furthermore, King stated that he had never seen a video of the incident and, to his knowledge, no such video existed. (*See* King Dep. 9:2-17). Here, in the absence of anything other than "rank speculation" suggesting that such a video ever existed, Amine's request for spoliation sanctions must be denied.

## VIII.

For the reasons that have been set forth above, Amine's motion for summary judgment is denied in its entirety and the Defendants' motion for summary judgment in granted in part and denied in part. Specifically, the Defendants' motion is (1) granted with respect to Amine's § 1983 claims based on the initial traffic stop, Amine's arrest and imprisonment, and the searches performed incident to his arrest; (2) denied with respect to Amine's § 1983 claim based on malicious prosecution; (3) granted with respect to all of Amine's state-law claims against Villemaire; (4) granted with respect to Amine's assault and battery, false arrest, and false imprisonment claims against King; and (5) denied with respect to Amine's malicious prosecution claim against King. Therefore, Amine may proceed against King on his (1) § 1983 claim based on malicious prosecution and (2) state-law malicious prosecution claim. Because summary judgment has been granted in Villemaire's favor on all of Amine's claims, he is dismissed from this case.


IT IS SO ORDERED.


Dated:  September 21, 2011                    S/Julian Abele Cook, Jr.
        Detroit, Michigan                    JULIAN ABELE COOK, JR.
                                             United States District Court Judge

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 21, 2011

<u>s/ Kay Doaks</u>
Case Manager